673 So.2d 505 (1996)
Curtis WILSON, Appellant,
v.
STATE of Florida, Appellee.
No. 94-2662.
District Court of Appeal of Florida, First District.
April 19, 1996.
Rehearing Denied June 3, 1996.
*507 Alan E. Rosner of Harris, Guidi, Rosner, Dunlap & Mordecai, P.A., Jacksonville, for Appellant.
Robert A. Butterworth, Attorney General; Amelia L. Beisner, Assistant Attorney General; Lisa D. Norris, Certified Legal Intern, Tallahassee, for Appellee.
VAN NORTWICK, Judge.
Curtis Wilson appeals the trial court's denial of his motion to suppress, arguing that the search warrant was unlawfully executed since the police did not comply with the knock-and-announce provisions of section 933.09, Florida Statutes (1993). Because we conclude that, under the particular facts of the instant case, the police had a reasonable basis for an unannounced entry, we affirm.

Factual and Procedural Background
In the instant case, a confidential police informant reported to the police that he had been in Wilson's home, where the informant noticed a "substantial quantity"[1] of off-white rock-like substance on the kitchen table, which the informant recognized as crack cocaine. The home was located on Irvington Avenue in Jacksonville. Within ten days, Detective Koivisto applied for and was granted a search warrant for that residence. The record reflects that, immediately preceding the execution of the search warrant, Detective Koivisto talked to Detective Thurne and discussed the execution of the search warrant on Wilson's house on Irvington Avenue. Detective Thurne then said: "Well, you know, that's the same guy's house that we served out on Lee Street." Detective Koivisto testified that he and Detective Thurne had served a warrant on a so-called drug "sales house" of Wilson's on Lee Street in Jacksonville and, when the officers executed the search warrant on the Lee Street house, several handguns were recovered.
Detective Koivisto and several other officers proceeded to the Irvington Avenue house. Detective Koivisto was wearing street clothes, and a blue vest with a reflector police marking across the chest over his bulletproof vest. According to him, he had a mask sitting on top of his head which was not pulled down, but it could be pulled down once he entered the residence so that those within would be unable to recognize his identity. When the officers arrived, they jumped from their vehicles and immediately began yelling "police, search warrant." Upon reaching the home the officers inserted a large pry bar into the outer burglar bar door and, using a sledge hammer to drive the pry bar, opened the burglar bar door. At the same time, they were yelling "police, search warrant." Detective Koivisto rammed the front door with a battering ram allowing the detectives to enter the home. No one knocked on the door.[2]
In the house, the officers found a trafficking amount of cocaine in a shaving kit in the kitchen. Regina Evans was in a back bedroom watching television. She said she heard banging, and the police ran in wearing ski masks. She testified that she asked the police why they did not knock on the door and that she would have let them in. She *508 also testified that she knew Wilson carried a gun.
Wilson was later arrested, in possession of a firearm, and admitted that the cocaine found in the Irvington Avenue house belonged to him.[3]
Wilson moved to suppress the evidence against him contending, among other things, that the warrant was illegally executed contrary to section 933.09, Florida Statutes (1993), which requires officers to knock and announce their presence before forcibly entering a residence. At the hearing, Wilson relied upon the supreme court's decision in State v. Bamber, 630 So.2d 1048 (Fla.1994). At the conclusion of the suppression hearing, the trial court orally announced its decision that, although the police officers had not complied with the knock-and-announce provision of the Florida Statutes, exigent circumstances justified a no-knock entry. The trial court stated its reasons, as follows:
However, in spite of the Bamber case ... the officers had reason to believe that the cocaine in question was in the kitchen of the house, and this being a quote, unquote, nice house with standard plumbing, it's certainly reasonable to believe it could have been easily disposed of at that particular location within the house.
They also had reasonable suspicions based upon prior knowledge of this defendant that he may be in possession of weapons, and not having any idea whether he was present at the time of the execution of this warrant,for officers' safety those two exigent circumstances as far as I'm concerned are satisfied....
Reserving his right to appeal the trial court's denial of his motion to suppress, Wilson pled nolo contendere to trafficking in 400 grams or more of cocaine or a mixture containing cocaine contrary to section 893.135(1)(b)1.c., a first degree felony, and was sentenced to a 15-year minimum mandatory and ordered to pay a $250,000 fine.

The Knock-and-Announce Rule and its Exceptions
Consistent with the common law protection of the home as a person's "castle of defense and asylum," 3 W. Blackstone, Commentaries 288, the knock-and-announce rule has long been a part of English and American common law. The earliest statement of the knock-and-announce requirement is usually thought to be in Semayne's Case, an opinion issued in 1603, in which the court held that, in serving a writ at a party's house, the sheriff was required to announce his authority and purpose.[4] Although Semayne's Case involved service of a civil writ, the rule of the case has been applied in both civil and criminal contexts. See, Robert J. Driscoll, Unannounced Police Entries and Destruction of Evidence after Wilson v. Arkansas, 29 Colum.J.L. & Soc. Probs., 1, 6-8 (1995). The knock-and-announce requirement has been recognized as a part of the common law of Florida. As Justice Terrell explained in Benefield v. State, 160 So.2d 706, 709 (Fla. 1964):
Entering one's home without legal authority and neglect to give the occupants notice have been condemned by the law and the common custom of this country and England from time immemorial.
* * * * * *
The law forbids the law enforcement officers of the state or the United States to enter before knocking at the door, giving his name and the purpose of his call. There is nothing more terrifying to the occupants than to be suddenly confronted in the privacy of their home by a police officer decorated with guns and the insignia of his office. This is why the law *509 protects its entrance so rigidly. The law so interpreted is nothing more than another expression of the moral emphasis placed on liberty and the sanctity of the home in a free country.
As most states,[5] Florida has adopted the knock-and-announce requirement by statute. See, Florida Statutes, sections 901.19 (making arrest) and 933.09 (1995) (executing search warrant). These statutes appear "to represent a codification of the English common law which recognized the fundamental sanctity of one's home...." Benefield, 160 So.2d at 710. In codifying the knock-and-announce requirement, Florida has also recognized the established exceptions to the common law rule. As the Benefield court concluded:
... Suspects have no constitutional right to destroy or dispose of evidence ... Moreover, since the demand and explanation requirements of [the forcible entry statute] are a codification of the common law, they may reasonably be interpreted as limited by the common law rules that compliance is not required if the officer's peril would have been increased or the arrest frustrated had he demanded entrance and stated his purpose.... Without the benefit of hindsight and ordinarily on the spur of the moment, the officer must decide these questions in the first instance.
Id. (quoting People v. Maddox, 46 Cal.2d 301, 294 P.2d 6 (1956), cert. denied, 352 U.S. 858, 77 S.Ct. 81, 1 L.Ed.2d 65 (1956) (citations and notes omitted). Thus, Benefield adopts the common law exceptions justifying an unannounced entry, holding:
[O]ur statute is violated by an unannounced intrusion in the form of a breaking and entering any building, including a private home, except (1) where the person within already knows of the officer's authority and purpose; (2) where the officers are justified in the belief that the persons within are in imminent peril of bodily harm; (3) if the officer's peril would have been increased had he demanded entrance and stated the purpose, or (4) where those within made aware of the presence of someone outside are then engaged in activities which justify the officers in the belief that an escape or destruction of evidence is being attempted.
Id.
Recently, the United States Supreme Court has recognized that the common law knock-and-announce rule forms a part of the reasonableness inquiry of the Fourth Amendment to the United States Constitution. Wilson v. Arkansas, ___ U.S. ___, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). However, the Court did not require a rigid rule that "every entry must be preceded by announcement," Wilson, ___ U.S. at ___, 115 S.Ct. at 1917, but recognized that "the common-law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances." Id. at ___, 115 S.Ct. at 1918. Thus, the Court held that "although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry." Id. at ___, 115 S.Ct. at 1919. The supreme court left to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment. The parties here have not raised, and we do not decide, whether Florida's knock-and-announce rule and its exceptions, as applied here, are reasonable under the Fourth Amendment in light of Wilson v. Arkansas. Our consideration here is limited to whether the unannounced entry in the instant case is lawful under section 933.09 and Benefield and its progeny.
The two Benefield exceptions applied by the trial court in the instant case, the destruction of evidence and officer-peril exceptions, have recently been discussed in State v. Bamber, 630 So.2d 1048 (Fla.1994), and *510 Craft v. State, 638 So.2d 1011 (Fla. 2d DCA 1994). In Bamber, the Florida Supreme Court declined to apply the Benefield exception allowing an unannounced entry where the destruction of evidence is imminent. Bamber involved a prosecution for possession of cocaine in which a motion to suppress was granted based upon an unreasonable unannounced police entry. The state there urged the court to adopt a "blanket" rule which would excuse forcible entry at anytime a small quantity of drugs is believed to be present in a residence with standard plumbing. Id. at 1053. The court declined, however, and held:
... that an officer's belief in the immediate destruction of evidence must be based on particular circumstances existing at the time of entry and must be grounded on something more than his or her generalized knowledge as a police officer and the presence of a small quantity of disposable contraband in a home with standard plumbing.
Id. at 1055. The court ruled "that police may engage in a no-knock search of a residence where officers have `reasonable grounds to believe the [contraband] within the house would be immediately destroyed if they announced their presence.'" Bamber, 630 So.2d at 1054-55, citing Earman v. State, 265 So.2d 695, 697 (Fla.1972). "In short," said the court, "forcible entry is lawful only under exceptional circumstances, where no reasonable alternative is available." Id. at 1055.
Applying this rule to the factual circumstances of Bamber, the court found no facts showing that police had reason to fear at the time of entry that Bamber was likely to destroy evidence or even that a readily disposable quantity of drugs was involved. While the affidavit attached to the warrant recited that, according to the informant, Bamber retrieved the drugs from an area near the bathroom, the court noted that nothing showed that this proximity of drugs to the bathroom was anything but happenstance, in that, since the Bamber residence was a four-bedroom, four-bath home, virtually any room in the home would have been near a bathroom. Id. at 1055, n. 6.
In Craft v. State, 638 So.2d 1011 (Fla. 2d DCA 1994), the Second District reversed the trial court's denial of the defendant's motion to suppress, finding that the information provided by two confidential informants was insufficient to bring the case within the officer-peril exception to the knock-and-announce rule. The court concluded that this information was insufficient because (i) the information from the first informant was over two years old at the time of the execution of the search warrant; and (ii), as to the information from the second informant that Craft was known to possess firearms, no testimony was presented concerning when the informant obtained this information, from whom this information was obtained, how it was obtained, when any personal observations may have been made, what they were, or where they were made. Id. at 1014. The court concluded that the testimony presented could be characterized as the type of generalized knowledge that the Bamber court found to be insufficient. Citing Bamber and Benefield, the Craft court said:
An officer's belief that he or she may be in peril if the knock-and-announce procedure is followed should be based on particular circumstances existing at the time of the entry and should be grounded on something more than generalized knowledge that a defendant has been known to carry a weapon at some time in the past.
Id. at 1014.

Application of the Knock-and-Announce Exceptions to the Instant Case
Wilson argues that Bamber and Craft compel reversal here. He contends that Bamber requires a finding that the destruction of evidence exception is not applicable here because, as in Bamber, "particularized" facts are not present here which would lead to a reasonable belief that drugs would be destroyed if the officers knocked and announced their presence before gaining entry.
As to the officer-peril exception, Wilson contends that at no time did the state bring forth any testimony regarding the officers' particular knowledge or belief that they, as officers, would be in peril if they followed the *511 knock-and-announce provisions of the statute.
The state first responds that the entry here complies with the knock-and-announce requirements of section 933.09. Alternatively, the state argues that the destruction of evidence exception is supported in the instant case by the fact that the officers had been notified in advance by a reliable informant[6] that Wilson was keeping the cocaine in the kitchen area of his home from which it could be easily destroyed. Next, the state contends that the officer-peril exception was present because Detective Koivisto had participated in an earlier search of a home owned by Wilson in which several firearms were seized. The state distinguishes Craft on the grounds that Officer Koivisto had personal knowledge that made him reasonably believe that Wilson could have been armed or have access to arms.
At the outset, we agree with the trial court's conclusion that the police did not comply with section 933.09. The officers failed to allow any time after their announcement of "police, search warrant" to permit anyone inside to open the door voluntarily before they broke open the door. In this regard we follow Craft, in which the court found no compliance with the knock-and-announce requirement where the officers broke into Craft's residence with a sledge hammer within seconds of or simultaneously with the officers' announcement "sheriff's department, search warrant." Craft, 638 So.2d at 1012. Thus, in order to sustain the trial court's order in the instant case, the facts of this case must fall within one of the exceptions to the knock-and-announce requirements of section 933.09.
Turning to the destruction of evidence exception, we must disagree with the trial court's conclusion that simply having "cocaine ... in the kitchen of ... a nice house with standard plumbing" establishes an adequate basis for a reasonable belief that evidence will be destroyed. Clearly, Bamber rules otherwise. Nevertheless, we find that here the police officers' knowledge of Wilson's drug operations, combined with the fact that cocaine was known, through a reliable informant, to be in the kitchen (as opposed to "near" a bathroom as in Bamber), constitutes a factual basis for a "particularized" and "reasonable" belief on the part of the officers that the evidence would be destroyed.
We are guided in our conclusions by the distinctions between the instant case and Bamber. The Bamber circumstances, found insufficient to support suppression, are set forth in detail in the opinion of the Second District Court of Appeal, State v. Bamber, 592 So.2d 1129 (Fla. 2d DCA 1991), which was approved by the Florida Supreme Court. State v. Bamber, 630 So.2d 1048 (Fla.1994). As the district court observed:
[W]e are not convinced that the existence of normal plumbing in one's home dispenses with the need to knock and announce during the execution of a warrant to search for small quantities of cocaine. Plumbing is required in virtually any home that complies with applicable building codes. Many warrants involve searches for small items that could in theory be flushed down a toilet. If flushable items and plumbing are allowed to create an exigent set of circumstances, then the exception will begin to overshadow the rule.
In this case, the police did not provide a case-specific explanation that reasonably caused them to believe that Mr. Bamber's household was likely to destroy evidence. There clearly are facts and circumstances under which the police can reasonably decide, at the time they serve a warrant, that a household presented an unusual risk concerning the destruction of evidence. Such circumstances are not presented in this case.
State v. Bamber, 592 So.2d 1129 at 1132-33 (Fla. 2d DCA 1991). The district court also describes circumstances which would allow the police to reasonably decide that an unannounced entry was necessary:
For example, there is no evidence in this record that the household contained any weapons or that the deputy had a valid *512 reason to fear that weapons would be used if he knocked at the door. The evidence does not suggest that the occupants had prior criminal records, had attempted to destroy evidence in the past, were known to be violent, had expressed an intention to destroy evidence, or had unusual sophistication concerning the destruction of evidence. This case seems to involve a standard home in a typical neighborhood, supplying drugs to a small group of customers. The evidence does not establish a "crack house" dedicated to the full-time sale of drugs. The plumbing in this house may be a factor that could have permitted only a brief announcement at the door, but it does not justify police disobedience of a long-standing statutory requirement.
Id. at 1133, fn. 3.
We conclude that, here, in contrast to Bamber, the police had reason to believe that Wilson was a dealer with at least one "crack house" dedicated to the sale of drugs in addition to his Irvington Avenue residence. Where the police have a reasonable suspicion that a person is dealing in drugs and running a crack house in which weapons are kept, it is reasonable to draw the inference that such a person would have a plan in effect to destroy drug evidence in his home before it can be confiscated, especially where the police are informed that the drugs are placed in the kitchen near a sink or disposal.[7]
Similarly, with respect to the officer-peril exception, we distinguish Craft. We conclude that, unlike Craft, here the officers' belief was based on more than generalized knowledge. In the instant case, based on the officers' actual knowledge of Wilson's possession of firearms at his Lee Street drug sales house, it is reasonable for the police to believe that firearms would be present at the Irvington Avenue house. Further, it is common sense for officers to believe that a person reasonably suspected to be in possession of both firearms and substantial quantities of illegal drugs will use his firearms to protect himself and his holdings and, thus, poses a threat to the safety of police officers attempting to seize the drugs. State v. Williams, 168 Wis.2d 970, 485 N.W.2d 42, 47 (1992); U.S. v. Singer, 943 F.2d 758 (7th Cir.1991). As the court in U.S. v. Singer, 943 F.2d at 762-63, succinctly put it:
It is a reasonable belief that a person in possession of both firearms and large quantities of drugs poses a threat to the safety of police officers attempting to seize the drugs. Indeed, the courts have recognized that a suspect's propensity for violence can be inferred from the quantity of drugs involved. See U.S. v. Bonner, 874 F.2d 822, 824-25 (D.C.Cir.1989) ("common sense and bitter experience ... suggests [that] dealers in narcotics possess firearms and that such weapons are as much tools of the trade as more commonly recognized drug paraphernalia); United States v. Kane, 637 F.2d 974, 980 (3d Cir.1981) (reasonable to deduce that weapons are necessary to protect large quantities of drugs); c.f. United States v. Buchanan, 910 F.2d 1571, 1573 (7th Cir.1990) (recognizing that guns are tools of the drug trade); United States v. Alvarez, 860 F.2d 801, 829 (7th Cir.1988) (same), cert. denied, 490 U.S. 1051, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989). With these considerations in mind, we believe the gun reputedly in Singer's possession posed a quantifiable risk to the safety of the officers executing the warrant; therefore, this exigent circumstance permitted the police to enter Singer's home, without first knocking and announcing their presence.
In short, we believe that the police in the instant case could reasonably infer that Wilson would be armed and in possession of a large quantity of drugs and would likely pose a threat to their safety when they sought to seize his drugs. Thus, we conclude that this case presents the particularized facts from which the officers could reasonably believe an unannounced entry was necessary to protect their safety and prevent the destruction of evidence.
AFFIRMED.
*513 ERVIN, J., concurs.
BENTON, J., dissents with written opinion.
BENTON, Judge, dissenting.
"[F]orcible entry is lawful only under exceptional circumstances, where no reasonable alternative is available." State v. Bamber, 630 So.2d 1048, 1055 (Fla.1994). An officer to whom a search warrant is directed "may break open any outer door ... to execute the warrant, if after due notice of his authority and purpose he is refused admittance to said house." § 933.09, Fla.Stat. (1989). But before forcing entry he is obliged to give notice of his authority, make demand for entry, and be refused, except in "an emergency that meets certain narrowly prescribed conditions." Bamber, 630 So.2d at 1052. Because the evidence adduced at the suppression hearing in the present case does not, in my view, support either the destruction of evidence exception as delineated in Bamber or the officer peril exception, I respectfully dissent.
To the extent the majority opinion approves the forcible, unannounced entry of a private dwelling in order to conduct a search merely on the basis of reason to believe that crack cocaine was in the kitchen, it flouts the clear, core holding in Bamber. Id. at 1055 ("[W]e hold that an officer's belief in the immediate destruction of evidence must be based on particular circumstances existing at the time of entry and must be grounded on something more than his or her generalized knowledge as a police officer and the presence of a small quantity of disposable contraband in a home with standard plumbing."). A larger "quantity of disposable contraband in a home with standard plumbing"not that it is clear that the quantity here was larger than the quantity in Bamber should logically be more, not less, difficult to destroy. See State v. Stepp, 661 So.2d 375 (Fla. 2d DCA 1995); State v. Blest, 647 So.2d 126, 127 (Fla. 2d DCA 1994) ("large supply of cocaine" suppressed); Mense v. State, 632 So.2d 185 (Fla. 3d DCA 1994); Hansen v. State, 372 So.2d 1003 (Fla. 4th DCA 1979).

Officer Peril Exception
The majority opinion also addresses important questions about the scope of the officer peril exception to the "knock and announce" requirement.[1] Although the exception is not a new one, Benefield v. State, 160 So.2d 706, 710 (Fla.1964), few reported Florida cases have found the exception applicable. But see Power v. State, 605 So.2d 856, 863, 862 (Fla. 1992), cert. denied, 507 U.S. 1037, 113 S.Ct. 1863, 123 L.Ed.2d 483 (1993) (arrestee's family told police he "had a violent background" and police knew he had committed several felonies while armed, including "armed robbery of a deputy, [and that he was] a black belt in karate, and had a gun"); Jones v. State, 440 So.2d 570, 573 (Fla.1983) (police had "strong reason" to believe that sniper who had just mortally wounded police officer was inside apartment with "ready access to firearms"); State v. Price, 564 So.2d 1239 (Fla. 5th DCA 1990); State v. Hills, 428 So.2d 715 (Fla. 4th DCA), review denied, 438 So.2d 833 (Fla.1983); State v. Avendano, 540 So.2d 920 (Fla. 2d DCA 1989); Williams v. State, 403 So.2d 430 (Fla. 3d DCA 1981).
Scarcely two years ago a unanimous Supreme Court of Florida rejected "the blanket approach for no-knock searches," Bamber, 630 So.2d at 1055 n. 8, explicitly declining the then unnecessary task of "address[ing] the safety issue." Id. at 1049 n. 2. Today's majority opinion leaps evidentiary hurdles that should likewise have obviated any need to grapple with "the safety issue" to give, on the merits, a disconcerting answer to what has more than once provenalthough fortunately *514 not in the present casea question of life and death.[2]

Procedural Posture
The search yielding the evidence which the trial court declined to suppress took place after a search warrant issued "for a single story, single family dwelling" at a specified address. Issuance of the warrant followed a finding that probable cause to search existed,[3] a finding predicated on Detective Koivisto's affidavit that a confidential informant had told him "that said informant has been inside the above described premises within ten (10) days of the application of the Affidavit for Search Warrant and at that time personally observed ... a substantial quantity of off white rocklike substance which the occupant represented to be cocaine (crack)."
"When a search warrant has issued, the defense has the burden of going forward, and the burden to establish grounds for suppression," State v. Setzler, 667 So.2d 343, 345 (Fla. 1st DCA 1995), where the finding of probable cause supporting the warrant is challenged. Here the defense argued for suppression on grounds the officers who executed the search warrant did not give notice of their authority or demand admission before entering a dwelling by force. But the defense also raised a challenge on grounds that the warrant was not supported by probable cause. The trial court rejected both contentions. On appeal, the contention that probable cause was lacking has been abandoned.
The "standard search warrant" that issued here did not purport to authorize unannounced, forcible entry into appellant's house, or rest on a finding that any exception to the notice and demand requirement applied. Neither the warrant nor the affidavit mentioned guns or other weapons. At a suppression hearing like the one below, even though a "standard search warrant" authorized a search, the de novo question[4] is "whether a no-knock search of a residence... [was] lawful based on exigent circumstances." Bamber, 630 So.2d at 1051.
"No statutory authority exists under Florida law for issuing a no-knock search warrant," Id. at 1050, and no such warrants can lawfully issue because of their "staggering potential for violence to both occupants and police." Id. Since Florida does not have "no-knock" warrants, the exception for good faith reliance on warrants, see United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), does not pertain to "knock and announce" questions.

Burden Of Proof At Suppression Hearing
On the question of the lawfulness of a forcible, unannounced entry, the prosecution has the burden of proof "because the State did not justify the [forcible, unannounced entry] before the fact." Setzler, 667 So.2d at 345. Cf. Jones v. State, 648 So.2d 669, 675 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2588, 132 L.Ed.2d 836. "Under the Fourth Amendment, a specific showing must *515 always be made to justify any kind of police action tending to disturb the security of the people in their homes. Unannounced forcible entry is in itself a serious disturbance of that security...." People v. Gastelo, 67 Cal.2d 586, 63 Cal.Rptr. 10, 12, 432 P.2d 706, 708 (1967). When the officer peril exception is invoked, "we must determine whether the officers had good reason to believe they might be in peril at the time of the execution of the search warrant." Craft v. State, 638 So.2d 1011, 1013 (Fla. 2d DCA 1994).
A movant with standing to seek suppression of the fruits of a "no-knock" search and seizure need only show that government agents failed to give notice of their authority and demand admission before forcibly entering a home, in order to place on the prosecution the burden of proving "particular circumstances existing at the time of entry," Bamber, 630 So.2d at 1055, justifying the failure to give notice and make demand. Craft; Rodriguez v. State, 484 So.2d 1297, 1298 (Fla. 3rd DCA 1986) (warrant to search for stolen gun cannot alone support officer peril exception to knock and announce requirement); Poole v. United States, 630 A.2d 1109, 1124 (D.C.App.1993), cert. denied, ___ U.S. ___, 115 S.Ct. 160, 130 L.Ed.2d 98 (1994) ("Where the government alleges that exigent circumstances excused compliance with the statute, that claim must be supported by specific evidence particular to the facts of the individual case."); People v. Ouellette, 78 Ill.2d 511, 36 Ill.Dec. 666, 401 N.E.2d 507 (1979); Parsley v. Superior Court of Riverside County, 9 Cal.3d 934, 109 Cal.Rptr. 563, 513 P.2d 611 (1973); Gastelo.

Burden Not Met Here
In Parsley, fruits of a "no-knock" search were suppressed because, at the suppression hearing, the prosecution's evidence, which "provide[d] the only possible excuse for the unannounced entry into the defendant's residence," 513 P.2d at 616, was found not to be competent. An analogous situation exists in the present case. The inference that a gun might be in the house the plain clothes officers stormed was based on intradepartmental hearsay which the trial court explicitly recognized as such. At the suppression hearing, Detective Koivisto testified on the basis of what he had been told by J.J. Thurne, a fellow officer:
A. J.J. Thurne asked me where I was going. I told him we were going to fixing to go serve a search warrant. He said, "Where at?" I said, "On Irvington Avenue." He described the house. And I said, "Yeah, that's it. Jackie Boy's house, Curtis Wilson's." He says, "Well, you know, that's the same guy's house that we served out on Lee Street...."
Q. Did he indicate to you that the Jackie Boy that you referred to in the search warrant that you were going to execute was the same Jackie Boy in the search warrant that was executed on Lee Street?
A. Yes.
Q. And were you there when you all executed the warrant on Lee Street?
A. Yes, I was.
Q. And what did you recover from the warrant you executed on Lee Street?
A. We recovered
MR. ROSNER (Defense Attorney): I object on relevancy. I believe it's on items recovered from a different residence at a different time. If that's the case, Judge,
THE COURT: I don't know what it might have to do with the issue of what they believe might occur within the premises as far as possible destruction, et cetera, of evidence. I don't know whether it'swhat it's got to do with that.
MR. FERGUSON (State's Attorney): It goes to officer safety, Your Honor. That's another exception to
THE COURT: All right. I will listen to it.
....
Q. What did you recover from service of the search warrant that Jackie Boy was associated with on Lee Street?
A. There were two or three handguns.
MR. ROSNER: I will also object to the phrase where Jackie Boy was associated with unless they can be more specific than that, Judge.
THE COURT: I don't know. You know, it's like substantial quantity. I don't *516 know what associated with means. I don't know what that means.
MR. FERGUSON: From the testimony thatI will rephrase it, Judge.
....
Q. J.J. Thurne associated Jackie, the name Jackie Boy with the warrant that you were about to serve at 4625 Irvington Avenue;
Is that correct?
A. Yes.
Q. And you associated the same Jackie Boy with the search warrant executed on Lee Street;
Is that correct?
A. That's correct.
MR. ROSNER: Objection to the leading form of the question and the over-broad nature of it. He associated him with it. To me that'sthat's an inference that he is dangerous. But it doesn't have any facts.
THE COURT: Well. I don't know if Jackie Boy was the Jackie Boy named in the warrant on Lee Street. I have no idea what associated means. I'm still having a problem with that. J.J. Thurne says, I know Jackie Boy. That doesn't really get to the issues, I don't think. You have to be more specific I think.
....
Q. Did J.J. Thurne name Jackie Boy as the person involved in the search warrant on Lee Street?
A. Yes, he did. He said that was Jackie Boy's sales house on Lee Street. He said it was the same Jackie Boy that lives on Irvington Avenue.
MR. ROSNER: Well, objection.
That's got to be hearsay based on hearsay.
THE COURT: No question about that. But we are only talking about matters like officers' safety and what is within the mind of the officers when they executed the search warrant and it was reasonable for them to have that in their minds. So, for the basis of what is in their minds I will let it come in.... right or wrong. It may be false.
MR. ROSNER: Yes, sir.
THE COURT: But what is in the officer's minds at the time of the execution of the warrant, and if it's reasonable for them to feel that way, is an issue in the knock and announce exception.
Now, go ahead.
(Emphasis added.) The record does not reveal any basis for J.J. Thurne's reported knowledge. Since the test for exigent circumstances is objective, not subjective, the only evidence adduced at the suppression hearing that even suggested officer peril[5] was not competent. It was rightly deemed hearsay: an out-of-court assertion that the house the officers were raiding was associated with the same person with whom another house was associated in which two or three handguns had been found. It is not enough to show that one police officer relied on the word of another police officer. Whiteley v. Warden, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971) ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.").
The trial court's implicit finding that Detective Koivisto relied in good faith on what a fellow officer told him does not establish the truth of the fellow officer's assertion or a basis for deeming it reliable. No evidence at the suppression hearing demonstrated that Detective Koivisto had independent knowledge of the asserted connection between the Lee Street house and the Irvington Avenue house. The prosecution did not meet its burden to demonstrate that exigent circumstances actually existed. "An unjustified but sincere fear by an officer cannot excuse noncompliance or the protection of the occupants' privacy interest would depend on no more than an officer's anxiety." United States v. McConney, 728 F.2d 1195, 1206 (9th *517 Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d. 46 (1984).

Break With Precedent
The majority does not explain why it rejects the holdings of Rodriguez or of State v. Drowne, 436 So.2d 916 (Fla. 4th DCA), review denied, 441 So.2d 633 (Fla.1983) (knowledge of machine guns on premises did not justify rushing unannounced through partially opened door), or of our own prior decision in Roundtree v. State, 544 So.2d 1101 (Fla. 1st DCA 1989) (Ervin, J.). Today's decision clearly conflicts with Rodriguez, where a policeman testified at the suppression hearing that "we knew we had a drug dealer supposed to be carrying a stolen gun to protect his drugs." Rodriguez, 484 So.2d at 1298 n. 1.
While reporting the views of the Wisconsin Supreme Court, the majority opinion makes no mention of the Illinois Supreme Court's countervailing views in Ouellette or of points the Alabama Court of Criminal Appeals recently found persuasive in a case where the prosecution apparently proved to the satisfaction of all that the police had reason to believe guns were on the premises at the time they conducted a search for cocaine:
Investigator David Sedberry of the Huntsville Police Department testified that police had been told by an informant that Jones had guns in the house. However, it is not illegal for citizens of the United States, except ex-felons, to have guns in the house. Exercise of the "right ... to keep ... arms," Amendment II, United States Constitution, does not lessen the protection against unreasonable searches and seizures. There is nothing in the record to indicate that the police knew that there was a person in the house who was in danger of imminent bodily harm. Neither was there any evidence that any police officer thought that he or she was in danger of immediate bodily harm. To the extent that the presence of guns alone was in itself considered an exigent circumstance, we overrule Beshears v. State, 593 So.2d 174 (Ala.Cr.App.1991).
....
As the California Supreme Court stated in People v. Dumas, 9 Cal.3d 871, 109 Cal.Rptr. 304, 309, 512 P.2d 1208, 1213 (1973):
"[O]ne of the primary purposes of [the knock-and-announce statute] ... is to prevent possible violent responses that might be aroused in a startled and fearful householder suddenly confronted with unknown persons breaking into his home for unannounced reasons. The danger that such a confrontation will result in serious injury or death to the occupant, police officers, or innocent bystanders is obviously intensified when the householder is in possession of a firearm. Thus, where the police are aware of such a weapon, the case for requiring them to give notice of their authority and purpose becomes more rather than less compelling."
Moore v. State, 650 So.2d 958, 963-64 (Ala. 1994), cert. denied, 650 So.2d 966 (Ala.1994), and cert. denied, ___ U.S. ___, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995). The majority opinion also omits any discussion of the carnage that led to the repeal of the short-lived federal no-knock statutes.[6]
Among other out-of-state authorities supporting the view that suppression was called for here are United States v. Marts, 986 F.2d 1216, 1218 (8th Cir.1993) ("[t]he reasonable belief that firearms may have been within the *518 residence, standing alone, is clearly insufficient" to justify an otherwise improper entry under federal knock and announce statute); United States v. Fluker, 543 F.2d 709, 717 (9th Cir.1976) (that person believed to be inside apartment owned gun did not reasonably support belief that he was armed and constituted a threat, absent evidence that he had ever been convicted of illegal possession or unlawful use of firearms); State v. Piller, 129 Ariz. 93, 628 P.2d 976, 979 (1981) (police knowledge that suspect purchased handgun did not justify noncompliance with knock and announce statute); Ouellette (occupant's prior possession of handgun did not justify failure to comply with knock and announce statute, absent evidence that prior possession was illegal, that he had ever used the weapon, or that he had ever threatened violence against the police); Commonwealth v. McDonel, 411 Pa.Super. 187, 601 A.2d 302, 305-06 (1991) (officers' knowledge of two-year-old conviction for possession of unlicensed firearm together with assumption that drug dealers commonly possess firearms insufficient to create exigent circumstances); State v. Jeter, 30 Wash.App. 360, 634 P.2d 312 (1981) (information that defendant kept a weapon insufficient to excuse noncompliance with the "knock and wait" rule).
The majority opinion fails to acknowledge the difference between an unsupported official claim of exigent circumstances and the particularized evidentiary showing our constitutions require. No basis was proven for any exception to the rule requiring officers serving a search warrant to give notice of their authority and make demand for admission, before using sledge hammer and battering ram to gain entry.
I respectfully dissent.
NOTES
[1] The affidavit for search warrant recites the informant saw a "substantial quantity" of cocaine. Later, Detective Koivisto explained he was told there was several ounces of cocaine on the table.
[2] At one point, Detective Koivisto explained: "This is the method that we use to execute search warrants fairly routinely because in most cases they are, like this, they involve guns with a possibility there is going to be some destruction of evidence. There are times when we execute warrants when that doesn't happen." Because the question of whether the execution of a search warrant complies with the law must stand or fall upon the particular facts in each case, we do not address this alleged "routine" practice of no-knock entries. Nevertheless, we are compelled to note that such a routine practice flies in the face of the requirement of State v. Bamber, 630 So.2d 1048 (Fla.1994), for the police to act on a case-by-case basis only where facts show the "particularized" and "exceptional" circumstances necessary to support an unannounced entry. As a result, any such routine practice would seem to unnecessarily risk suppression of evidence that might otherwise be obtained in circumstances where a knock-and-announce entry is required. Here, however, we have confined our inquiry to the particular facts of this case, and we decline to invalidate the execution of this warrant on the grounds that warrants may or may not be being executed in an inappropriate manner in other cases.
[3] We do not address the question of whether Wilson's confession would have been subject to suppression, if we were to find that the police officers violated the knock-and-announce statute. See e.g. Albritton v. State, 634 So.2d 1114 (Fla. 1st DCA 1994).
[4] The court in Semayne's Case stated:

In all cases when the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors.... Semayne's Case, 5 Co.Rep. 91a, 91b, 77 Eng.Rep. 194, 195 (K.B. 1603).
[5] A commentator has recently noted that of the 47 jurisdictions that have enacted statutes permitting forcible entry, 35 require law enforcement officers to provide prior notice of their identity and purpose. Further, of the 12 states whose statutes are silent on the knock-and-announce requirement, nine have judicially mandated such notice. Jennifer M. Goddard, The Destruction of Evidence Exception to the Knock and Announce Rule: A call for Protection of Fourth Amendment Rights, 75 B.U.L.Rev. 449, 458-59 (1995).
[6] The record reflects that Detective Koivisto had used the informant for several years and, based on reliable information provided by the informant, had arrested ten suspected criminals.
[7] Courts in other jurisdictions have observed that cocaine is a drug that can easily be flushed down a sink or toilet. State v. Stevens, 181 Wis.2d 410, 511 N.W.2d 591, 598 (1994); Commonwealth v. Rodriguez, 415 Mass. 447, 614 N.E.2d 649, 650 (1993).
[1] Its protestations notwithstanding, the majority decides important constitutional questions today. See Wilson v. Arkansas, ___ U.S. ___, ___, 115 S.Ct. 1914, 1919, 131 L.Ed.2d 976 (1995) ("For now, we leave to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment."); State v. Lavazzoli, 434 So.2d 321, 322 (Fla.1983) ("[T]he people of the State of Florida approved an amendment to article I, section 12 of the Florida Constitution, effective January 4, 1983 ... [which] mandated conformity of the interpretation of article I, section 12's exclusionary rule with the United States Supreme Court's interpretation of the fourth amendment to the United States Constitution.").
[2] The "bullet proof" vests issued to Jacksonville's law enforcement officers do not necessarily assure the officers' safety. As personal representative of his estate, the widow of a Jacksonville law enforcement officer sued the manufacturer of the vest he was wearing (under plain clothes) when he was gunned down inside a Jacksonville residence, on "an undercover investigation which resulted in heavy gunfire and loss of life." Sanders v. American Body Armor and Equip., Inc., 652 So.2d 883, 884 (Fla. 1st DCA), review denied, 659 So.2d 1088 (Fla.1995).

Sanders was shot fifteen times. An expert testified that he died of two bullet wounds one to the abdomen, and one to the chest both fatal, and both inflicted "split seconds" apart. One bullet came from the weapon of an assailant, and one, inadvertently, from the weapon of a fellow officer.
Id.
[3] The warrant finds and the affidavit alleges reason to believe that the house was being "used for the purpose of violating the laws relating to drug abuse, to wit: possessing and/or concealing controlled substance described as: cocaine (crack)." Neither document mentions sales.
[4] The question is de novo at the suppression hearing. Reviewing courts "must apply different standards of review, depending on the nature of the questions presented. Aspects or components of the trial court's decision resolving legal questions are subject to de novo review, while factual decisions by the trial court are entitled to deference commensurate with the trial judge's superior vantage point for resolving factual disputes." State v. Setzler, 667 So.2d 343, 344-45 (Fla. 1st DCA 1995).
[5] The only occupant of the house at the time of the raid was a young woman watching a soap opera in a bedroom. She testified that officers entered the room with guns drawn, while she was undressing. Nothing in the record explains why it was thought (if it was) that "Jackie Boy" was on the premises.
[6] As recounted by the Bamber court:

The Ninety-first Congress concluded that announced entries posed a great problem in narcotics cases and passed a controversial "no-knock" warrant provision as part of the Comprehensive Drug Abuse, Prevention, and Control Act of 1970.
The new legislation authorized federal "no-knock" warrants when the issuing magistrate found probable cause to believe that notice might allow suspects to destroy evidence. Congress also enacted a broader provision authorizing "no-knock" warrants for the District of Columbia.
....
The "no-knock" experience lasted four years and demonstrated the inevitability of many of the dangers foreseen in 1970. During the four-year period when "no-knock" warrants were issued, horror stories were legion....
The federal "no-knock" warrants were so disruptive that Congress repealed them four years later.
Bamber, 630 So.2d at 1051 n. 4.